for Jody Rudman, Ernest Leonard, Leonard and Ron Portugal. And you know what your time a lot of time is. 8282 and 20 minutes for the government. Okay. With that, I suppose you're first, Ms. Rudman. Yes, sir. Good morning and may it please the court. I am Jody Rudman on behalf of Rocky Anderson. As the court knows, there are two main issues which predominate this appeal. Either one requires a reversal of the judgment. And I'd like to start with the issue of the failure to prove that Blue Cross as the indictments named victim is a health care benefit program as defined by statute. Two things are undisputed. The first is that with regard to every single claim in this case, Blue Cross served in the role of third party administrator of the American Airlines ERISA plan. And the second thing that's undisputed is that the word administrator is not found in Congress's definition of health care benefit program at 18 USC 24 B. And that's a noteworthy omission. Because Congress knows what an administrator is. Congress defined administrators in the ERISA statute. Congress has passed other statutes within Title 18 that name administrators by name. And so the short answer is if Congress intended for third party administrators of ERISA plans to be included in the definition of health care. What's the difference? What's the difference? I mean, many, many Americans, of course, get their health care from Blue Cross. And I trust that in those cases, you would not dispute that Blue Cross would be covered. What makes this case different? That's correct, your honor. In this case, Blue Cross is not serving in the role of insurer. Blue Cross doesn't underwrite the benefits. Blue Cross doesn't draft the benefits. Blue Cross doesn't pay for the benefits. What Blue Cross does is it processes paperwork as frontline administrator, as a service to American Airlines, because it's American Airlines that funds the claims, underwrites the claims, drafts the claims and a good description of what Blue Cross does when it is serving in the role of administrator is found in this court's decision in a case we cited in our reply brief, which is the Methodist Hospital case at. Let's see, Methodist Hospital at 814 Fed Third 242, but it's a it's a distinct and and significant difference between serving as administrator and serving as insurer. So let me let me use an analogy. In many cases, a client will hire an attorney and pay the attorney's fees directly. In other cases, an insurance company will step in and pay for the attorney, but the client will nevertheless obviously have the benefit of the attorney's services. Are you saying that the client is getting legal services in the first case, but not in the second just because of the difference of payer? No, I don't think that applies necessarily to suggest that the client is not getting legal services. But this is a this is a very distinct situation in that Congress has specifically defined what is and what is not by leaving administrators out of the definition. A health care benefit program. You're saying the key difference is in a traditional Blue Cross setting. Blue Cross is essentially paying for the health care services, accepting the risk, if you will, that health care will be more expensive than they than their actuaries expect. Whereas in a case like this, it's really American Airlines that is paying for any unexpected health care costs. But otherwise, it seems to me that in either situation, Blue Cross is providing the health care, just like in my law firm example. In either case, the lawyer and the law firm are providing legal services. The only difference is who's paying for it. Not so because Blue Cross has nothing to do with the drafting of the benefits. Blue Cross can only receive the claims and process my insurance analogy. The insurance might tell the attorney, look, under our policy, we're only required to cover certain types of claims, not other types of claims. So you shall only represent the client as to X and not Y. Otherwise, I am paying. Blue Cross is not in a contractual relationship in any way with the plan participants, wherein it tells these participants this is what you're entitled to and this is what you're not entitled to. And at the end of the day, if a participant decides that his or her benefits were wrongly denied and seeks to sue in federal court under ERISA, it's not Blue Cross that the participant sues. It's American Airlines. So American Airlines- Let me ask you this. You have another issue. And I do think the evidence that's to rock you is important to consider. And we do have your brief on this. But let me talk to you just in terms on this first point of the statute itself. Is it Blue Cross or an agent, an administrator? It seems to me we would have to say that an administrator or an agent is not providing a medical benefit or a service. And it does seem to me Blue Cross is very much providing medical or providing services to the individuals who are involved in this case. Why doesn't that work? Yes, in a different role than as Judge Hozol calls it traditional Blue Cross coverage. But isn't there still a service being provided by Blue Cross? Your Honor, there's not a medical item, medical benefit or medical service that Blue Cross provides when it serves as administrator of the plan. Every witness has testified- That's good. You've answered my question. Why don't you move on to the evidence against Rocky? Sure. Let me remind the court of a few salient points that are in our briefs about Rocky. Rocky was an employee of the Anderson Optical and Hearing Aid Company. Rocky is a high school educated hearing aid fitter and dispenser. Rocky had no management role in the company. Rocky had no authority in the company. Rocky had no check writing ability with regard to the company. And Rocky was acquitted of a conspiracy. And these are all important and salient facts when assessing Rocky's specific intent to defraud or lack thereof for the conduct that he was accused of. As the court knows, the issue of fraud, the theory of fraud in this case is triggered on the submission of hearing aid claims for the American Airlines plan participants. And the court's decision on Rule 29 was that the mere submission of a claim constitutes an implicit representation that hearing aids are medically necessary. The problem with that, particularly for a fellow in Rocky's position, is the problem of intent. Because at no point anywhere in this record is there any indicia, any evidence of a threshold, an objective criteria, a number, a baseline, anything that would have told Rocky Anderson, this is when a hearing aid is medically necessary, this is when a hearing aid is not. So without some measure of objective criteria by which Rocky could say, you get a hearing aid, you don't, this claim gets to be submitted, this one doesn't, it is not reasonable, it's not rational to find that Rocky knowingly made a fraudulent representation or that Rocky acted with a specific intent to defraud. And Judge Southwick, on this point, I would point out to you, you wrote an opinion for the court in 2012 in a case called United States versus Patel. It's at 485 Federal Appendix 702, in which the court gave some credence to this idea of the vagueness of medical necessity. At the end of the day, that case is quite different than this one. But your concerns on that point were well-founded. I see that I'm out of time. So if the court doesn't have any additional questions. Thank you. Thank you. Two minutes on rebuttal. Mr. Leonard, I believe you're next. Thank you. May it please the court, I represent Terry Anderson on this case. The heart of a fraud case is a misrepresentation. In this case, because there was no overt misrepresentation, the district court sustained the conviction on the basis of an implied representation. And it relied upon this court's opinion in U.S. Briggs. As I laid out in the brief, that case is very different because that case, there was facts that did show that the defendant, who's convicted of bank fraud, actually knew that she was concealing and making essentially implied representation of authority. In this case, we do not have this. We have claims being submitted by the office personnel in the same manner they've always been submitted. It's very different for the Briggs case. There are three fundamental problems with finding an implied misrepresentation of medical necessity in this case. The first problem is that the term medical necessity is uncertain. No one seemed to understand what medical necessity meant in the context of hearing aids. The only written document, and it's key because to make an implied representation, you have to have knowledge of what you're representing. The only written document that we saw that had any definition of medical necessity was an amendment to the provider agreement, which was government exhibit 55, which defined medical necessity as health care services that a physician exercising prudent clinical judgment would provide for purposes of treating an injury, illness, or disease. That's the only document we saw that term defined. Terry Anderson, however, is not a physician. He's not a medical provider. He is a hearing aid fitter with a high school level education. Yet, despite that, he was approved by Blue Cross as a provider. Now, when I cross-examined the government's expert on that, he agreed that hearing aid fitters were not medical providers, and he said that the term medical necessity is used differently depending on the context. And actually, I asked him, I said, do you show medical necessity when you submit an insurance claim form 1500? His answer, it depends on what you mean by medical necessity. I followed up. I said, well, then again, it depends on the context, right? He said, absolutely. And typically, I would also cite a case from Judge Southwick of U.S. v. Martinez. Often, once I find out who the panel is, I look and see if there are similar cases that have been published. U.S. v. Martinez, 921 F. 3rd, 452. Judge Southwick said, our cases leave a simple but significant rule so long as jury was not forced to rely on disconnected generalizations to conclude tests were not medically necessary and instead had some evidence to support impropriety of each claim, there would be sufficient evidence for conviction. Compare that language to what we have here, which is said, it depends on the context. In addition, in addition to a written definition that doesn't apply to the expert who says it's the context, Blue Cross internally wasn't even sure if medical necessity was a requirement for hearing aids. While both representatives, Dr. Weisberg and Ms. Weisberg, saw an email, Government Exhibit 61, in which they were confused about whether or not it applied. So, in a nutshell, what the problem with this conviction is, it's based entirely on an implied misrepresentation, a term whose meaning depends on the context, a term that even Blue Cross's contract says only applies to physicians, and a term that Blue Cross was confused over whether it applied or not to hearing aids. Mr. Leonard, your client is an audiologist, is that the term? I'm sorry, weren't you asking the expert? Was your client an audiologist, I would say? My client? Yes. No, he was a fitter and dispenser. Okay. Does he have any standards that he's supposed to go by to decide who needs a hearing aid? There are no standards per se such as that. For example, they've got various tests, there's nothing that says if you're at 80% you get a hearing aid, if you're at 79% you don't. It's a very kind of a subjective, because hearing aids, the purpose of hearing aids are quality of life. Both experts testified as to standards, and there's not a firm standard at all. A lot of the testimony by the government's expert was as to what certain tests that should be conducted. In fact, the court kind of hung on to the issue of, well, this whole battery of tests weren't being conducted. The statute itself, which is occupational code 402.352, lists several tests that can be conducted by hearing aid fitters, not audiologists who are doctors, but high school educated fitters, and it uses the term shall try. The fitter shall try to do the following and list the number of tests. Is a hearing aid fitter with a high school education supposed to glean from this vague shall try language that industry standards require him to determine medical necessity based on each and every test? Your honor, there's not a standard such as that. Even the statute itself says shall try. We mentioned in the brief that there was a the complaint that was filed with the state licensing board, and the files that were given the state licensing board often did not have all those tests. They would conduct some of the tests. We're not disputing the evidence said not all the tests were conducted. The state licensure board saw some of those tests were conducted, some weren't, and they dismissed the complaint and that there was not sufficient evidence to establish there was a violation of the hearing aid statute rules. So we take a high school educated fitter who was governed by a board with language that says shall try, and in this particular case didn't even find a violation. How is he supposed to know that I have to take all these tests to define medical necessity, a term that the meaning depends on the context, and as I mentioned in the brief, to be an implied misrepresentation, there has to be knowledge. No one ever told Terry Anderson, you have to submit hearing aids for purposes of medical necessity and not quality of life. For example, I want to hear my granddaughter's piano concert. No one ever told Terry Anderson that. So he cannot be held liable. The conviction cannot be sustained on that implied misrepresentation. Thank you, sir. You have two minutes on about Mr. Portugal. It pleased the court. Brian Portugal for the United States. I'd like to do three things with my argument this morning. First, I would like to go through the evidence of the fraud. Second, I'd like to address the Blue Cross Blue Shield issue. And third, I'd like to go through a rebuttal to some of the arguments that my opposing counsel has made in their briefs and their arguments today. First, I think it's important to focus the court on standard of review that is applicable to sufficiency of the evidence cases. The tenor of the appellant's arguments in their briefs is to want to rehash the evidence and show why the jury should have accepted their theories of the case. Of course, under this court's case law, that is not the standard. All the inferences and view of the evidence cuts in favor of the jury's verdict. The defendants appear to want to pile their inferences in their favor, and of course, that is not the standard either. As to medical necessity and the evidence that it was lacking, one of the most important pieces of evidence at the trial was the fact that the beneficiaries, the submission of their claim forms 1500, all showed, or almost all showed, that they had been diagnosed with sensorineural hearing loss. Contrary to what the appellants would have you believe, that itself is evidence that the appellants were aware of the medical necessity requirement. Why would they have included that on the claim form, but for their awareness of medical necessity? Also, Mr. Portugal, both sides have been talking understandably about medical necessity, but the jury was never given a definition on medical necessity, were they? I don't recall if the charge specifically had a definition of medical necessity. If Chief Judge Lynn left that to the jury based on the expert testimony of Ross Roser, the government's expert, whose testimony... I remember something along the lines of Judge Lynn saying that medical necessity is clear as mud or something like that, and did not give an instruction. I'm a bit at a loss that the focus is so much on medical necessity when the jury wasn't... Were they required to find in some way that there was medical necessity, or how would you say the jury, since we're supposed to give great deference to their decision, how were they instructed to deal with something related to whatever I was talking about? I think the charge followed this court's pattern jury instruction on 1347, Your Honor, and left it to the jury to determine or accept the government's theory of fraud, which was medical necessity. They heard from the expert witness, Ross Roser. They heard from expert witness, Katie Bryce. They heard from employees of Anderson Optical, and... Well, that's fine, counsel, but without a definition, I think of it in terms probably too personal, but it could well be that my wife believes it's time for me to get hearing aid, but are they medically necessary or just spousally necessary in some way? Well, I think... And the definition that either Mr. Leonard gave, I think, but maybe it's Ms. Rudman, made sense. It's not necessary sounds like the wrong word. It's just what a reasonable audiologist or expert believe is appropriate medical treatment for the condition of the patient, which maybe is what medical necessity means, but this focus on necessity seems to be potentially misleading to the jury. Well, I think what the district court did, Your Honor, was to leave it to the jury to accept or reject what was industry standard and what was required under the Blue Cross Blue Shield plan, and the jury had ample evidence to determine that in order for a hearing aid to be medically necessary, a fitter and dispenser of hearing aids had to go through a prescribed battery of tests in order to make a determination, and certainly in addition to hearing evidence of the standard of care in the industry, they also, excuse me, Your Honor, they heard evidence from a Blue Cross Blue Shield medical director. That was Leslie Weisberg. She's at 1455 of the record, and she specifically testified about Government's Exhibit 91, and that was Blue Cross Blue Shield's explanation of how to determine whether a hearing aid would be medically necessary. There was a prescribed battery of tests, and the evidence was undisputed at trial that the appellants did not use this battery of tests. They used a single component of the battery of tests, a single component that was described by the expert as a screening test for hearing. It's a binary test. You either pass or you don't, and almost all of the employees of American Airlines who testified explained they went through that same test annually, a screening exam, not to check for hearing aids, but a pure-tone audiogram hearing check. What's the purpose of that, Counsel? The purpose of the screening, Your Honor, is to determine whether further evaluation is necessary. So if you fail the screening exam, that's when you would need to have a full battery of tests to determine what the source of your hearing problem is and how potentially to remedy it. And these employees had to go through the screening test every year, you said? That's correct, Your Honor. It's important to note that Terry Anderson admitted in a cross-examination that he did not do this full battery of tests. The beneficiaries testified that Terry and Rocky didn't do the full battery of tests. They did, again, the simple pure audiogram test. An Anderson Optical employee testified that when she did the fitting at Anderson Optical, she felt rushed. Appointments were made every 30 minutes. There was testimony that the full battery of tests took up to 45 minutes and possibly an hour to complete if you included the patient with the prosecutor. About 102 testings that were done at American Airlines on a single day, and assuming that only 60% of those qualified for hearing aids, it worked out to about 10 minutes of test. There's also a crucial component of the inducements that Anderson Optical offered to American Airlines employees and their families to get them to agree to testing. Beneficiaries told the jury that they just wanted the glasses, they weren't really interested in hearing aids, and indeed, some of these simply never picked up their hearing aids. Yes, Your Honor, they were complimentary. That was an inducement to get them to come in and get screening and agree to the hearing aids. In fact, one of the beneficiaries testified that they were told that the hearing aids came with the glasses and they couldn't get the glasses without the hearing aids. If I could turn now to the issue of the Blue Cross Blue Shield benefit plan, the plain language of the statute does not require what the appellants would read into it. It is... Let me ask you as you get into this, would there have been any problem in naming American Airlines as the entity rather than Blue Cross? Is there any reason not to have done that? I don't think that there would have been a problem doing that, Judge Southwick. I think this was simplicity for the indictment. If American Airlines had been named as the healthcare benefit program provider, then I think the Macarita case would be especially applicable because then you would have directly that Blue Cross Blue Shield was the agent of American Airlines. It does seem to me that one way to look at what happened here is at the time of the indictment, perhaps it wasn't full understanding of the relative roles of American Airlines and Blue Cross. The indictment was made and now, with all due respect to you, Mr. Portugal, there's some is a medical program, whatever the phrase is. I'm not asking you to acknowledge anything, but it does seem to me the cleaner case and the straightforward case would have been to have included an indictment, American Airlines. Is that last statement at least a fair point? Well, Judge Southwick, I'm certainly not going to dispute how you think that the case would have best been charged, but I would say that the way it was charged is supported in the plain language of the statute. The statute simply requires that there be a contract and under that contract, healthcare beneficiaries receive care. There's no requirement in the plain language of the statute that the persons who receive care be in privity. So, we have a contract. The contract is between American Airlines and Blue Cross Blue Shield and under their contract for Blue Cross Blue Shield to administer the plan, the American Airlines employees receive healthcare items and services. When an American Airlines employee asks for a particular healthcare service, who makes the decision whether that's an appropriate insurable healthcare claim? Blue Cross Blue Shield, not American Airlines. Correct. Mr. Portugal, Ms. Redmond suggests that because Blue Cross fits the definition of an administrator, that it could not also fit the definition of a provider. What do you say to that? I say that that argument finds no textual support in the text of the statute. ERISA is an entirely separate statutory scheme and here we're dealing with a criminal statute that takes as a given definition of a healthcare benefit program and I don't believe that textual silence about administrator takes anything away from the textual clarity of a contract under which these folks receive benefits. Mr. Portugal, let me ask you on the text for you to tell me who fits where. Under 24B, we have the contract and what you say is the tax commerce, we're good on that. At least nobody challenges that. Under which any medical benefit, and I would say the way to read it is any medical benefit, and I'm adding these, medical item or medical service is provided to any individual. So what is it that Blue Cross is doing that is a medical benefit, medical item, or medical service? Well, just answer that. Blue Cross Blue Shield has a network of service providers and they are making those providers available to the American Airlines employees and they are fronting the costs for those services to the American Airlines employees. And there's no reason that just the fact that they're reimbursed, that doesn't take away from there being a provider? No, your honor, and if you think about it, even if Blue Cross Blue Shield was not just a third-party administrator, let's say they were an ordinary insurance provider, the insurance provider is not literally giving services to the beneficiaries. They're not diagnosing illnesses and handing out prescription drugs. So I don't think that that makes, I don't think that that makes the difference in this case. If I could turn to a few of the theories that the appellants have postulated in their briefs and arguments, just address them briefly, and time is winding down and I know the court is busy. First, in their brief, and in his brief, Rocky says that the district court rejected aiding and abetting liability. And I just want to clarify, the district court rejected aiding and abetting liability as to Terry and Rocky being liable for healthcare fraud committed by Anderson Optical employees. In other words, the district court said there was no evidence that Anderson Optical employees were committing healthcare fraud on their own, and therefore, Terry and Rocky couldn't be liable for that healthcare fraud. It's not my understanding, reading the district court's opinion, that the district court in any way indicated that Terry and Rocky could not be liable for aiding and abetting each other. The aiding and abetting was pled in the indictment and it was charged to the jury. Second, both appellants make a point about a material variance based on inclusion of billing codes, and that goes back to what I was mentioning a moment before, the censonorial hearing loss, and that doesn't create a material variance. What it does is the indication of those billing codes, that is the representation or one part of the diagnosis, unless you're aware that medical necessity is a requirement and you want to deceive. And certainly, the expert, Ross Rozier, and I particularly want to point the court to his testimony on recall, not in rebuttal, but he testified out of order, and that begins at 2230 of the record, and he walks the jury through every single count in the indictment. There was certainly, according to the expert, without the full battery of tests, you could not properly diagnose censonorial hearing loss. I also want to address the email exchange that the appellants have addressed. This is an email exchange. I don't know if you'll get to this, so let me, why don't you close what you're saying just a moment ago, not close your argument at all. What was the evidence that these two individuals, defendants, knew of the requirements that you're talking about? How was this guidance given to them, or in what way are they responsible legally for what you're saying was necessary? The best thing I can point you to, Judge Southwick, is the testimony of Katie Bryce, and she's at 1987 of the record. She works for the licensing authority for fitters and dispensers, and she testified about what tests were required in order to make diagnoses to fit for hearing aids, and then also, again, Ross Rozier, in his first part of his testimony at 1190, who testified about industry standard for diagnosis, and then also Leslie Weisberg, again at 1455 of the record and government's exhibit 91, testified about the actual requirements of the Blue Cross Blue Shield plan. Okay, but what I'm asking you is, what was before the jury on how these two defendants, their responsibility, or their ability to know the sorts of things that you're talking about, they got into this business, what would have triggered their obligation to learn this? Is the mere fact they're submitting, not mere, the fact that they're submitting these forms create that legal responsibility? Well, certainly, their provider agreement with Blue Cross Blue Shield, they should be aware of what Blue Cross Blue Shield requires, but very quickly, again, Katie Bryce, the licensing expert testified about the training and the course of study that fitters and dispensers must go through in order to be licensed to perform this hearing aid fitting. Very quickly, I'm almost out of time, but I don't want to let this go unanswered. The email exchange between Leslie Weisberg and someone within Blue Cross Blue Shield, there was, it's been characterized as though Blue Cross Blue Shield wasn't sure that hearing aids had to be medically necessary. That's not correct. In Ms. Weisberg's testimony, she goes through the provider agreement and the contractual requirement of medical necessity. They'll quibble with language, but if you read in her testimony, one of the government's exhibits, it's clear that hearing tests and hearing aids, and then specifically the email that they reference, where it said that medical necessity might not be required. What they were talking about there, your honor, was the billing process. When a bill comes in for hearing aids, they were talking about these things that are called edits, which are checks of the claim before it's paid. And the internal person was telling Dr. Weisberg, we don't have an edit to check these for medical necessity before they're paid. So what she was saying was, in theory, we could be paying for medically unnecessary hearing aids. My time is almost over, so I will briefly conclude unless there are any questions. I thank the court for your time. This is a strange time, and I hope to you all in New Orleans again soon. With that, I would ask the court to affirm the judgments of conviction. We would enjoy being seen in New Orleans sometime. Thank you, Mr. Portugal. Mr. Redmond, you're first, I think. Yes, thank you, your honor. Thank you. So starting at the beginning, I just would encourage the court to take a look at 814 Fed Third 242. That's the Methodist Hospital case. And in that case, this court decided that American Airlines, when serving as the administrator of self-funded welfare benefit plans, does not draft the benefits, does not pay for the benefits, does not bear the risk of medical costs. And in that case, Blue Cross in that role was deemed not subject to the Texas Prompt Pay law. So if Blue Cross's limited and proscribed role as articulated by this court in 2016 was such that Blue Cross isn't liable under the Texas Prompt Pay law, why would those same facts, why would those same circumstances, why would that same relationship entitle Blue Cross to all of the benefits and rights of victimhood under a statute which it is not defined, in which it is not defined? The second point is this issue of medical necessity. And Judge Southwick, you are exactly right. There are no, there were no standards, thresholds, criteria that the jury ever heard about or was instructed with regard to on the issue of medical necessity. And the best that the government can do, both in its briefing and here in oral argument, is to elevate the standard of care and bootstrap that into a fraud claim. That just simply is not a specific intent to defraud. There is no record evidence that Rocky would have ever known what constitutes a medically necessary hearing aid. And I would note in my last 10 seconds that with regard to the medical policy, page 1389 of the record, Patricia Esko testified that that entire policy is inapplicable to every claim in this case. We ask the court to reverse the judgment. Thank you. Let me extend your time just a bit, Ms. Rudman. One of the things your opponent said, your friend on the other side, that the training to be licensed, and in other ways there was evidence that that was some of the evidence, but there was evidence in front of the jury that both defendants, but Rocky specifically asked you, would have received training necessary to know what tests had to be given and whether it's a battery of tests, the defense counsel I think dispute that characterization. What do you say to that, that there was evidence in front of the jury that what you're talking about, whatever level of education these individuals had, they were trained and they weren't, didn't absorb the training that still is an obligation that they had before filling out these forms and submitting them and who filled them out and whatever else, but being a party to the submission of these. What do you say to that? Here's what I would say, your honor. There is a distinct and operative difference between training, learning how to do something and even demonstrating proficiency in order to receive your license and being required to do it at the peril of being accused of intentional fraud because merely demonstrating that you know how to do something is quite different than knowing that you have an obligation to do it or you're going to be charged with a crime. And what's so noteworthy about that is that the state looked at records in which the state saw that these tests weren't all done and the state absolved Rocky, dismissed its investigation and found that there was no evidence to establish a violation of the you've answered the question. Thank you. Thank you, Judge Dennis. Mr. Leonard. Yes, I would like to address Judge Southwick's question to counsel for the government. The question was what evidence did the defendants have that they knew of the requirement of medical necessity? And that is critical because without that knowledge, you cannot have an implied misrepresentation. And what counsel for the government gave us, I think is their best case. And it's not much. You mentioned Katie Bryce. She was a work for the Department of Licensing Regulation. And she basically testified in general things are required. But she what she did not do because she was not a fitter and dispenser. She did not was not able to testify as an expert like that. What we gave the court in a brief was the law. The law doesn't say you must take every do every one of these tests before it's medically necessary. The law says we shall try. And as countless Rudman just pointed out, when faced with instances, actual case files, where they did not take all the do all the tests, the government of the licensing board said, no violation. Second, as long as we shall try, try and you shall try, shall try and do what shall try to what the gave a list of several things that take you down information, so forth. And in the list of I believe was five requirements. There were some tests that were indicated in there. Significantly, the test that Blue Cross says you must do this, the battery of tests that we've heard about included tests that were not on the licensing board's statute, and a tip. Adultery test is one of them that fitters are unable to administer. So, uh, simply, it's not there. In addition, the battery of tests. Well, I'm out of time. There's more questions. Thank you. Uh, I suppose if, if any, if I asked to submit some.